| UNITED STATES DISTRICT COURT | EASTERN DISTRICT OF TEXAS |

| UNITED STATES OF AMERICA, | § | |
|---|---|---|
| Plaintiff, | § | |
| *versus* | § | CIVIL ACTION NO. 1:13-CV-17 |
| BROTHERS ENTERPRISES, INC., CONTINENTAL INSURANCE COMPANY, TOM'S WELDING, INC., and LEESBORO CORPORATION, | § | |
| Defendants. | § | |

**MEMORANDUM AND ORDER**

The government is suing Defendants Brothers Enterprises, Inc., ("Brothers"), Tom's Welding, Inc. ("Welding"), and Leesboro Corporation ("Leesboro") for violations of the Oil Pollution Act ("OPA"), 33 U.S.C. §§ 2701-2761.[1] Pending before the court are the government's motion for summary judgment (#107) against Brothers and Welding and Brothers's cross-motion for summary judgment (#112) against the government. Having considered the motions, the submissions of the parties, the pleadings, and the applicable law, the court is of the opinion that both motions should be denied.

I.  Background

This lawsuit involves the cleanup of an oil spill emanating from the oil barge DIA-1A (the "Barge") into waters near Orange, Texas. Brothers purchased the Barge at a United States Marshal's sale on April 23, 2008. The double-hulled Barge was built in 1975 and had a 23,735 barrel cargo capacity. After Hurricane Ike struck the Texas coast on September 13, 2008, the

---

[1] The government also sued Continental Insurance Company, but those claims have since been settled.

Barge, which contained both an "oil/water solution" and "asphaltene,"[2] became grounded on wetlands adjoining a tributary to the Sabine River near Orange, Texas. Brothers subsequently hired a marine surveyor, Mark Shiffer ("Shiffer"), owner of Mark Shiffer Surveyors, Inc. ("MSS"), to assess the Barge's condition.

In his initial report, submitted on September 20, 2008, Shiffer noted:

> The subject vessel was aground, nearly perpendicular to the shoreline, with the bow facing inland. The stern was located approximately 20' inshore of the water's edge. The vessel was lying upon marsh grass, on what appears to be a soft muddy bottom. The marsh appears to have an elevation of roughly 1' to 2' above [ ] the mean water level . . . . The bottom plate was not sighted. The area surrounding the vessel did not appear to have any pilings or other protuberances.

Shiffer further concluded that while the Barge did not sustain any "new damage" during Hurricane Ike, it had previously suffered some "old damage." Specifically, the "aft deck plate was found to have waste holes," and the "port gunwale was found with a 12' x 12' hole in way of the number 3 void."

On an unspecified date shortly after submitting his initial report, Shiffer learned that the Barge was resting on top of gas pipelines, some of which were identified as "high pressure." At deposition, Shiffer stated that upon discovering that the Barge was "sitting" on top of the pipelines, he became concerned and recommended that the Barge "needed to be moved" because it "presented a danger." Brothers thereafter directed MSS to solicit bids from companies that could remove the Barge from its beached location. Coral Marine Services, L.L.C., ("Coral"), a company specializing in salvage and recovery operations, was ultimately selected. Coral arrived on site on November 7, 2008, with a 250-ton salvage derrick barge and a small towboat. After

---

[2] Asphaltene is a heavy black oil that remains solid at normal temperatures but liquefies when heated.

a week of operations, however, Coral abandoned its removal efforts "due to [the] dangerous proximity to underground pipe lines."

Tom Khai Dinh ("Dinh"), a co-owner of Welding, thereafter approached Brothers and submitted a removal bid. Welding's initial bid, which acknowledged that the Barge was located "on top of 3 gas line[s]," was submitted on December 12, 2008. On December 27, 2008, Welding submitted a revised bid, again stating, "[w]e understand that the Barge is on top of the 3 pipe line[s]," and adding that "[Welding] will take full responsibility of any damage while remov[ing] the Barge." On December 30, 2008, Welding signed a wreck removal agreement with Brothers and thereafter became the sole owner of the Barge.

Welding's initial removal plan was to use two "heavy pull winches" to pull the Barge off the beach while injecting a biodegradable soap to "break suction and aid in minimizing friction in the dragging process." Once that plan proved unsuccessful (the Barge moved only three inches), Welding turned to its "Plan B"—a proposed cutting up of the Barge into two parts, each of which would purportedly have been light enough to pull off the bank. According to Dinh, the Barge would "never sink because it's got a self-container." Dinh apparently tried to obtain approval from the United States Coast Guard for this salvage plan on three separate occasions, but the requests were denied because they lacked specificity. In the meantime, the Coast Guard reportedly warned Welding "not to do any cutting up on [the] Barge without having an approved salvage plan."

Once Dinh realized that any future recovery operations with Coast Guard approval would be cost prohibitive, he attempted to sell the Barge to another buyer. On September 2, 2009, Dinh sold the Barge to Yung Lee ("Lee"), a scrap dealer and the owner of Leesboro Corporation, for

3

$1.00.[3] On October 8, 2009, the United States Coast Guard discovered oil discharge from the Barge into the Sabine River and sent Welding an Administrative Order stating:

> On October 8, 2009, personnel from our office conducted an investigation into a salvage operation at the Port of Orange in Orange, TX which involved the removal of approximately 20,000 gallons of number six oil from the barge DIA-1A. During the investigation, the Coast Guard discovered the following; an oil discharge into the Sabine River originating from the barge DIA-1A, improper disposal of waste materials, lack of an environmental response plan, and failure to comply with the previously approved salvage plans.

In response to the spill, which purportedly released more than 110,000 gallons of oily water and 34,400 gallons of heavy oil into the Sabine River, the Coast Guard launched a cleanup operation that included spill management, roadway construction, oil product extraction, staging area development, and steel removal. According to the government, these cleanup efforts continued through at least March 17, 2010, and cost approximately $1,315,620.85.

In its instant motion for summary judgment, the government argues that there are no genuine issues of material fact that Brothers and Welding violated OPA because they were both "responsible parties" when the Barge's grounding created a "substantial threat of a discharge." In its cross-motion for summary judgment, Brothers argues as a matter of law that it (1) could not have been a "responsible party" because it did not own the Barge at the time of the oil discharge, and (2) the Barge's grounding on top of gas pipelines did not create a "substantial threat of a

---

[3] Leesboro has since dissolved, and Lee's current location is unknown. The Clerk of Court has entered multiple findings of default against Leesboro. *See* Docket Nos. 63, 102, and 118.

discharge."[4]  Welding's response to the government's motion for summary judgment essentially mirrors the arguments set forth by Brothers.

II.     Analysis

   A.     Summary Judgment Standard

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  The parties seeking summary judgment bear the initial burden of informing the court of the basis for their motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which they believe demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Technical Automation Servs. Corp. v. Liberty Surplus Ins. Corp.*, 673 F.3d 399, 407 (5th Cir. 2012); *QBE Ins. Corp. v. Brown & Mitchell, Inc.*, 591 F.3d 439, 442 (5th Cir. 2009).  Where "the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor."  *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original); *see Addicks Servs., Inc. v. GGP-Bridgeland, LP*, 596 F.3d 286, 293 (5th Cir. 2010); *Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409, 412 (5th Cir. 2003); *Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 372 (5th Cir. 2002).

---

[4] In its response to the government's motion for summary judgment, however, Brothers takes a contrary position, admitting that "[t]here are material fact disputes" as to whether: (1) "[Brothers] was the responsible party for the vessel at the time of the discharge;" and (2) "the Tank Barge DIA-1A presented a 'substantial threat' of pollution from September 13, 2008, through December 30, 2008."

"A fact is material only if its resolution would affect the outcome of the action . . . ." *Wiley v. State Farm Fire & Cas. Co.*, 585 F.3d 206, 210 (5th Cir. 2009); *accord Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012); *Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446, 454 (5th Cir. 2005). "'Factual disputes that are irrelevant or unnecessary will not be counted.'" *Tiblier v. Dlabal*, 743 F.3d 1004, 1007 (5th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "An issue is '*genuine*' if it is real and substantial, as opposed to merely formal, pretended, or a sham." *Bazan ex rel. Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001) (emphasis in original). Thus, a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Poole*, 691 F.3d at 627; *Bayle v. Allstate Ins. Co.*, 615 F.3d 350, 355 (5th Cir. 2010); *Wiley*, 585 F.3d at 210.

Once a proper motion has been made, the nonmoving parties may not rest upon mere allegations or denials in the pleadings but must present affirmative evidence, setting forth specific facts, to demonstrate the existence of a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 322 n.3 (quoting FED. R. CIV. P. 56(e)); *Anderson*, 477 U.S. at 256; *Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc.*, 738 F.3d 703, 706 (5th Cir. 2013); *Bayle*, 615 F.3d at 355. "[T]he court must review the record 'taken as a whole.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *see Riverwood Int'l Corp. v. Emp'rs Ins. of Wausau*, 420 F.3d 378, 382 (5th Cir. 2005). All the evidence must be construed in the light most favorable to the nonmoving party, and the court will not weigh the evidence or evaluate its credibility. *Reeves*, 530 U.S. at 150; *Downhole Navigator, LLC v. Nautilus Ins. Co.*, 686 F.3d 325, 328 (5th Cir. 2012); *EEOC*

v. *Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 615 (5th Cir. 2009). The evidence of the nonmovant is to be believed, with all justifiable inferences drawn and all reasonable doubts resolved in its favor. *Groh v. Ramirez*, 540 U.S. 551, 562 (2004) (citing *Anderson*, 477 U.S. at 255); *Cotroneo v. Shaw Env't & Infrastructure, Inc.*, 639 F.3d 186, 192 (5th Cir. 2011), *cert. denied*, 133 S. Ct. 22 (2012); *Tradewinds Envtl. Restoration, Inc. v. St. Tammany Park, LLC*, 578 F.3d 255, 258 (5th Cir. 2009).

A party may move for summary judgment without regard to whether the movant is a claimant or a defending party. *See Apache Corp.*, 626 F.3d at 794 (considering cross-motions for summary judgment); *CQ, Inc. v. TXU Mining Co., L.P.*, 565 F.3d 268, 272 (5th Cir. 2009) (same). On cross-motions for summary judgment, the court examines each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party. *White Buffalo Ventures, LLC v. Univ. of Tex. at Austin*, 420 F.3d 366, 370 (5th Cir. 2005); *accord CareFlite v. Office & Prof'l Emps. Int'l Union, AFL-CIO*, 612 F.3d 314, 318 (5th Cir. 2010); *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 498 (5th Cir. 2001). Cross-motions for summary judgment will not, in and of themselves, warrant the granting of summary judgment unless one of the parties is entitled to judgment as a matter of law. *Joplin v. Bias*, 631 F.2d 1235, 1237 (5th Cir. 1980); *Bricklayers, Masons & Plasterers Int'l Union of Am. v. Stuart Plastering Co.*, 512 F.2d 1017, 1023 (5th Cir. 1975). The rationale for this rule is that each party may move for summary judgment using different legal theories that rely upon different sets of material facts. *Bricklayers, Masons & Plasterers Int'l Union of Am.*, 512 F.2d at 1023. Nonetheless, cross-motions for summary judgment may be probative of the absence of a factual

dispute when they reveal a basic agreement concerning what legal theories and material facts are dispositive. *See id.*; *Schlytter v. Baker*, 580 F.2d 848, 849-50 (5th Cir. 1978).

B. OPA

Under OPA, "each responsible party for a vessel . . . from which oil is discharged, or which poses the substantial threat of a discharge of oil . . . is liable for the removal costs." 33 U.S.C. § 2702(a). OPA imposes strict liability upon responsible parties. *In re Needham*, 354 F.3d 340, 345 (5th Cir. 2003); *see* 3 BENEDICT ON ADMIRALTY § 112(a)(2) (7th ed. 2004) (citing H.R. REP. NO. 101653, at 102 (1990) (Conf. Rep.), 1990 U.S.C.C.A.N. 779, 780). "To demonstrate that a party is strictly liable, the government must prove that (1) the defendant is a 'responsible party' (2) for the 'facility or vessel' (3) 'from which oil was discharged, or from which there was a substantial threat of discharge,' (4) 'into or upon the navigable waters or adjoining shorelines' and (5) that the discharge resulted in 'removal costs and damages.'" *United States v. Viking Res. Inc.*, 607 F. Supp. 2d 808, 815 (S.D. Tex. 2009) (citing 33 U.S.C. § 2702). Here, only the first, third, and fifth prongs are in dispute.

1. Responsible Party

OPA defines a "responsible party" for a vessel as "any person owning, operating, or demise chartering the vessel." 33 U.S.C. § 2701(32)(A). The government argues that "[b]ecause both Brothers and [Welding] admit they owned the barge while it lay stranded . . . they are liable under OPA as responsible parties." Brothers and Welding respond that they do not fall under OPA's definition of "responsible party" because they did not own, operate, or demise charter the vessel when oil began to leak. In the court's view, the plain language of the statute, in conjunction

8

with the Act's legislative history, supports a broader interpretation of "responsible party" than that advanced by the defendants.

As an initial matter, OPA does not limit the number of responsible parties. Rather, it provides that "[n]otwithstanding any other provision of law . . . *each* responsible party for a vessel . . . from which oil is discharged . . . is liable for the removal costs and damages specified." 33 U.S.C. § 2702(a) (emphasis added); *see Smith Prop. Holdings v. United States*, 311 F. Supp. 2d 69, 81 (D.D.C. 2004). Congress's use of the word "each" suggests that Brothers's and Welding's position is untenable because their interpretation of OPA could render that word meaningless. Additionally, joint and several liability would be an unnecessary form of relief if only one party could be deemed a "responsible party." The plain language of the statute, then, contemplates situations where multiple parties may be responsible for a vessel's spillage. By defining "responsible party" broadly, Congress ensured that more than one entity could be held accountable for the costs of pollution stemming from oil discharges. *See United States v. Bois d'Arc Operating Corp.*, No. 98-157, 1999 WL 130635, at *4 (E.D. La. Mar. 10, 1999) ("The legislative history of OPA is consistent with and comports with a broad definition of responsible party.").

Notably, the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-9675, a statute to which courts frequently look when interpreting OPA, broadly "extend[s] liability all the way down the causal chain, from those who generate waste through those who dispose of it." *United States v. Slay*, No. 1:11-CV-263, 2013 WL 1312559, at *8 (E.D. Tex. Feb. 27, 2013) (citing *OHM Remediation Servs. v. Evans Cooperage Co., Inc.*, 116 F.3d 1574, 1578 (5th Cir. 1997)). "Because [CERCLA] imposes strict liability, plaintiffs generally need not prove causation." *OHM Remediation Servs.*, 116 F.3d at

9

1578. Further, the United States Court of Appeals for the Second Circuit has held that "[b]ecause it is a remedial statute, CERCLA must be construed liberally to effectuate its two primary goals: (1) enabling the EPA to respond efficiently and expeditiously to toxic spills, and (2) holding those parties responsible for the releases liable for the costs of the cleanup." *B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1198 (2d Cir. 1992). Consequently, "the common purposes and shared history of CERCLA and the OPA," further suggest that OPA's "responsible party" language should be read broadly. *Buffalo Marine Servs. Inc. v. United States*, 663 F.3d 750, 756 (5th Cir. 2011).

Additionally, OPA's definition of "responsible party" contains no temporal indicators suggesting that a prior owner of a vessel is immune from liability once that vessel is sold to another party. *See Unocal Corp. v. United States*, 222 F.3d 528, 535 (9th Cir. 2000) ("OPA does not contain any explicit temporal definition of 'cause' which distinguishes antecedent causes of a spill from the failure to contain a spill once it occurs."). Rather, § 2703—a section that neither Brothers nor Welding mentions—provides a *responsible party* with a complete defense to liability if it establishes, by a preponderance of the evidence, that the discharge was caused "solely by" an "act of omission of a third party." 33 U.S.C. § 2703(a)(3) (emphasis added). Accordingly, Congress envisioned a situation in which a "responsible party" could be absolved of liability as a result of the acts of a third party. Instead of pursuing that avenue for relief, Brothers and Welding invite the court to interpret "responsible party" in a way that is at odds with the Act's intended purpose.

Indeed, OPA was enacted in 1990 in the aftermath of the 11 million gallon oil spill—then the largest in this country's history—from the *Exxon Valdez* in Prince William Sound, Alaska.

The law was intended to streamline the federal legal process and "provide quick and efficient cleanup of oil spills, compensate victims of such spills, and internalize the costs of spills with the petroleum industry." *Rice v. Harken Exploration Co.*, 250 F.3d 264, 266 (5th Cir. 2001) (citing S. REP. NO. 101-94, *reprinted in* 1990 U.S.C.C.A.N. 772, 723). Brothers's and Welding's suggestion that only the contemporaneous owner of a vessel should bear responsibility—in this case, a defunct corporation that purchased the Barge from Welding for a mere $1.00 while it rested on top of three gas pipelines after two salvaging operators were unable to secure its removal—is inconsistent with the clear intent of the statute. Accordingly, the court declines to hold that Brothers and Welding were not "responsible parties" as a matter of law.

Brothers also argues that it is not a "responsible party" because it did not receive "pre-suit notice," as required under 33 U.S.C. § 2713(a), and because the government is "estopped" from seeking relief under OPA because it did not identify Brothers as a "responsible party" before May 9, 2011. The government first responds that it provided pre-suit notice to Brothers in May 2011 when it mailed the notice via certified mail to the address on file for Brothers Enterprises, Inc., as listed in the Alabama Secretary of State's Government Records Inquiry System. At deposition, however, Wendell Spencer, a co-owner of Brothers, stated that the first time he had been provided a copy of the government's pre-suit notice was during the deposition. Accordingly, a fact issue regarding compliance with the notice requirement remains, and the court therefore cannot determine at this juncture whether Brothers is, in fact, a "responsible party." Brothers's estoppel argument, for which it cites no authority, is without merit because OPA imposes no deadline for the government's designation of an entity as a "responsible party." Nevertheless, as explained below, because a genuine issue of material fact remains as to whether the Barge posed a

11

"substantial threat of a discharge" when it lay stranded on top of gas pipelines, the court need not determine whether Brothers or Welding are, in fact, "responsible parties."

### 2. Substantial Threat of a Discharge

The government argues that the Barge posed a "substantial threat of a discharge" as a matter of law when Brothers and Welding owned it because it "lay stranded in the tidal wetland, containing oil, above the gas pipelines, and subject to deterioration from wind, weather, future storms, and seas." Brothers disagrees, asserting that "[a]t the time that Brothers owned the [B]arge, [it] was sitting safely on top [of] the soft mud, intact, structurally sound, and could be there today intact and structurally sound, and still not present a substantial threat of discharged oil." Welding similarly argues that "[a]t all times relevant to this motion, the double-hulled Barge at issue was structurally intact," and that "[t]he condition of the Barge, with respect to cargo tanks, did not change until after the Barge was sold to Leesboro Corporation on September 4, 2009."

As an initial matter, the parties have not directed the court to any authority holding that a stranded barge either poses or does not pose a "substantial threat of a discharge" under OPA *as a matter of law*. Instead, the government points to a single case—*Progress Marine, Inc. v. Foremost Ins. Co., Grand Rapids, Mich.*—for the proposition that "[t]here is an inherent risk of pollution when a tank barge is stranded near a high-pressure gas line." 642 F.2d 816, 821-22 (5th Cir. 1981). *Progress Marine, Inc.*, however, is of little value here, as it (1) concerned an insurance dispute that was resolved nine years before OPA was enacted (and therefore could not have interpreted the language relevant at issue in this case) and (2) explicitly declined "to pass final judgment on [the] case." Accordingly, *Progress Marine, Inc.* is persuasive authority at best.

12

In this case, the record demonstrates significant disagreement as to whether the Barge constituted a "substantial threat of a discharge" when it remained stranded on top of oil pipelines. Shiffer, for example, stated unequivocally at deposition that "[t]he barge presented a danger to the pipelines because the barge was sitting on the pipelines." Captain Richard L. Frenzel testified that the Barge needed to be removed, at least in part, because it was "sitting on the three gas lines." James Kirby, a marine science technician for the Coast Guard, stated that "[t]he problem was that [the Barge] was sitting in that location which was on top of gas pipelines, which basically were threats to a safety and environmental area surrounding the barge."

Brothers and Welding, however, direct the court to contrary testimony. John Luff, a marine inspector for the Coast Guard, noted at deposition that he "started to be concerned about pollution threats" only once Welding submitted its salvage plan—a full 3 months after the Barge had been sitting on top of the gas pipelines. When Dean Harrison ("Harrison"), a marine surveyor who testified for the government at deposition, was asked whether he "saw anything in the Coast Guard 'requirements' or any of the documents from the Coast Guard . . . that indicated that [the Barge] was a substantial threat of polluting before [Welding] submitted its plan to break up the barge in May of 2009," he replied, "I don't think so." Furthermore, Brothers and Welding direct the court to Captain Randal Ogrydziak's deposition testimony, wherein he agreed that "if a barge presents a substantial threat of pollution," it becomes the "responsibility" of the Coast Guard to notify the responsible party of said threat so it can be neutralized. As a consequence, Brothers and Welding argue that the Coast Guard's failure to notify them that the Barge constituted a "substantial threat of discharge" while it rested on the gas pipelines is compelling evidence that the Barge never posed a "substantial threat of a discharge."

Accordingly, after considering the conflicting testimony, and remaining mindful of the fact that the court will not weigh the evidence or evaluate its credibility, the court finds that a genuine issue of material fact remains as to whether the Barge constituted a "substantial threat of a discharge" when it was grounded on top of the oil pipelines.[5] *See Reeves*, 530 U.S. at 150.

III. Conclusion

Based on the foregoing analysis, both the government's and Brothers's motions for summary judgment are denied. The government's OPA claims against Brothers and Welding may proceed to trial.

SIGNED at Beaumont, Texas, this 30th day of June, 2015.

*Marcia A. Crone*
MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE

---

[5] As a result, the court need not consider the final prong in dispute—whether the discharge resulted in removal costs and damages.